Please the court and counsel. My name is Michael Love. I'm attorney from Spokane, Washington. I represent Randy Thompson in this particular matter. Mr. Thompson is a educator who has worked in education for over 33 years. He's currently working at Ridgeline High School teaching world history and health. During his 33 years prior to the matter that has brought us here today. He was well regarded educator, both as a teacher, coach and assistant principal. He had no prior discipline and his performance evaluations were excellent. What we're asking the Ninth Circuit to do is to reverse the lower courts rulings in this particular case, which denied Mr. Thompson's motion for partial summary judgment as well as reversing the summary judgment that was granted to the defendants at the lower court. I would note that this case has had a prior procedural history. This case was in front of a different panel of the Ninth Circuit Court of Appeals on the of an interlocutory appeal appeal as it related to the issue of qualified immunity for the individual defendants. That qualified immunity was denied. But one thing that's important for the purposes today is that there were some important concessions that were made. One was is that Mr Thompson on August 17 of 2020 was, while watching the Democratic National Convention, speaking as a private citizen and speaking on a matter of public concern. The evidence appears to be uncontradicted that the district, based on his Facebook post, took an adverse action against him in, one, placing him on administrative leave and then later transferring him to a position as a certificated teacher, so removing him as an assistant principal. This case, essentially when you look at the Pickering analysis, hinges on the really the fourth element and that has to do with the school district's interest in, for instance, preventing disruption or the reasonable prediction of disruption. In this particular case, Mr. Thompson asserts that there is no evidence in the record of any actual or material disruption or reasonable prediction of disruption to the school district. Mr. Thompson, when he posted this Facebook post on August 17, 2020, it was intended to be a post to a limited group of people. He had his Facebook post set on private and not public. Mr. Thompson was at home during this time. It was during the summer. He was not performing any duties as an assistant principal or an employee of the school district. He was simply at home watching the Democratic National Convention. His post did not identify him in particular as an employee of the school district. And in some of the other where it has been brought up about media exposure, prior to his lawsuit, Mr. Thompson did nothing to have this particular post exposed to the public, people in the community, or to the media. After he posted this on August 17, he was two days later contacted by Assistant Superintendent Jay Rao. Mr. Rao indicated to him that the post had been seen. Mr. Thompson was surprised by that. Mr. Rao indicated that this was very serious. Mr. Thompson indicated during that phone call with Mr. Rao that he was essentially speaking on a constitutional First Amendment basis. Mr. Rao stated that he disagreed with him, that this was serious, and that he had been instructed by Mr. Small, the superintendent, to place him on administrative leave. Now, the Ninth Circuit in D'Elia has said that administrative leave is considered a form of an adverse action. Was he continued at the pay rate, excuse me, was he continued during this administrative leave at the pay rate of assistant principal? He was. Yeah, okay. So if we're talking about back pay, the pay during that period continues at his level, okay. Right, except for when then he was transferred to the certificate position. Yeah, later on. Mr. Thompson. Counsel, let me ask you this. So I know you mentioned that Mr. Thompson intended that to be a private Facebook post. It wasn't meant to be disseminated. Does it matter? Whether he intended it for it to be private? Yeah, I mean, I tell kids all the time when they come to field trips to my court, don't put things online that you don't want everybody to see because eventually somebody will be able to get a hand, you know, their hand on it and show it to everybody. Does it matter? Does it make a difference? Well, I think it can make a difference in some of the cases if he actually had made it public. There's a Damiano case that's been brought up, but in that particular case the intent of the parties, they had very strong feelings about a certain issue that was related to the school and they actually had made that very public and that was one of the distinguishing issues in this case. In this particular case, it's conceded that he was speaking as a private citizen and his intent was to have that. He had it clicked on as a private message. What happened was Megan McMurtry, who worked with him, saw the post and then she took that post and shared it with another co-worker who then shared it with another administrator who then shared it with her husband, who was an administrator, and that's how it got to Superintendent Small. Was Megan on his list of friends or something? Well, she must have been in order to have seen the post. Well, it must have been. She says maybe. I mean, I read her testimony. She says, I think so, or she's got some sort of ambiguous terms about it. Right, right, right. Counsel, let me ask a question because I'm not an expert on Facebook. When a person has a message that they deem generally private, but they wanted to go to all the people they listed as Facebook friends, does it go to every Facebook friend that they have? You know, that I don't know, Your Honor. I have a Facebook account, but I don't necessarily use it except to see other things that may have been sent to me. I don't know that. I know that you can limit it to a certain group of people, a certain number of people, and his intent was around 12 Facebook friends that shared similar political beliefs as he did. Quick question for you. At the time he's put on administrative leave, which happens very quickly, does the school Was there some reason to suspect that maybe it was broadcast more broadly? I mean, what did they know at the time they put him on administrative leave to do the investigation? They knew very little other than the fact that there had been this post and who the person was that initially saw it and then shared it with another person. So there was a total of four people. So what I'm after is when the school board puts him on administrative leave, right there at the very beginning, when I should say the superintendent puts him on leave right there at the very beginning, I'm trying to figure out if they had a reasonable basis to do that while they tried to figure out the nature of the post, whether it had been purely private or whether it had been public. Because, as I think you're arguing, if it had been private, that's one thing. Had it been public, that meant quite another. Right. And our position is there was no reason to put him on administrative leave. I understand that. But I'm trying to figure out at the time they put him on administrative leave, was there some reason to at least suspect that it had been widely broadcast instead of simply given to 12 of his Facebook, quote, friends? Our position based on the record, Your Honor, that there was no reason to suspect that. And then later on, as it turned out, there was nothing that Mr. Thompson had done that led to any wide dissemination. I mean, he immediately, what happened was his his mother apparently had called him or contacted him, which is similar to the Noble case that we've cited in our brief, where the person is contacted by a family member, somebody has seen this that, you know, should not have seen it. So within a short period of time, he then he took the post down, disabled it. Yeah, no, I see that. What I'm after is, once they start the investigation and put him on administrative leave, things start to go south pretty fast because one of the investigators discovers all these phrases about sort bus, then things go on and he claims that it was altered and they find that it really that's a false claim. I mean, all kinds of things happen afterwards that seem to me an appropriate basis for discipline. So I'm trying to figure out, before all things started going south, was the school board justified in putting him on administrative leave? Because I think that's the strongest part of your case. As you got further along, we got more trouble for your client. I don't think it was appropriate to place him on administrative leave at that point because the only thing they had was was the post that had been seen by some people. Right. The stuff that happened afterwards, what the district did was, they sent him, first they called him, they tell him you're on administrative leave, then they send him a letter. At that point, they hire an investigator, an attorney by the name of Ann Allen, to do this investigation. She interviewed the people. Then they asked to broaden the investigation. But again, you're talking about a person that had no prior discipline. I mean, his entire career in the 33 years had been stellar. And then, interestingly enough, she interviews a Mike Siren, who prior to that, had written letters of recommendation for Mr. Thompson, who was a candidate, to become a principal. Mr. Siren wrote this letter of recommendation six months prior to his post. But during the investigation, he said that he'd had some concerns with some of these things that we briefed, alleged comments that were made, you know, to students. But he was never disciplined for any of that, even though Mr. Siren knew about this, or would have known about it, as his boss at Evergreen Middle School. So then they proceed to then do, the district proceeds to do these impact interviews of other people, including two school board members that were ultimately ones that were supposed to review his appeal on the transfer. But one of the important points here is, is that there has been a concession that this was a private, he spoke as a private citizen on a matter of public concern. Yes, I understand that concession, but as you've heard me say, I'm trying to figure out, at the time they first put him on administrative leave, do they, does the school board know that? Well, I think the school board would have known, I think the superintendent is the one that would have known, how this whole thing came about, as far as the train of people, the four people that was the train that brought this there. Council, let me, sorry, let me ask you, I do have a follow-up factual question. How many people to date have actually seen the post, well, not to date, during the investigation, have actually seen the post? The people that would have, during the impact interviews, there was eight people that they interviewed. They didn't show them the post, they read the post to them. There would have been... Prior to reading the post to them, they were not aware of the post? No. Okay. No, there was only, there was only, this led up to four, to his 12 Facebook friends, and then Megan McMurtry sharing it, which led a chain of three other people to get to Mr. Small, which immediately led to his administrative leave. There was no media, there was no, no community members saw this, no students, no parents, and there were absolutely no complaints. Council, I have a question for you. Yes. Did you say that the record does not show how many Facebook friends he had, to whether he had 12 Facebook friends, or a hundred? The Facebook post, the record, I believe, shows that he had about two dozen Facebook friends around that number. So did the... I'm not sure, Your Honor. So did his post go to all the Facebook friends? That, that I don't know. I don't know if he limited it to the Facebook friends. I know that it's undisputed in the record that it was set on, on private, for only his friends. It was not, it was not set on a public setting. But if it's set on that it could go to his friends, then presumably all of his Facebook friends would receive it. It could happen that all of his Facebook friends may have seen it. My understanding from the record, though, he had a limited, he did have a limited friend group. But you don't have a number. I don't have a number, I don't have a number. I think I read the number 12. Yeah, 12. I'm out of time. Counsel, counsel, counsel, for appellant, so you could prepare. I'll give you two minutes extra time for rebuttal. Beautiful counsel for appellate, Mr. McFarland, I think. Good morning, Your Honors. May it please the Court, McFarland. I represent Central Valley School District and the individually named defendants. In analyzing Mr. Thompson's retaliation claim, I really think there are two different aspects of his claim that need to be analyzed separately. Because the analysis is really different with respect to the two different claimed adverse employment actions, and there are two separate set of facts that relate to the two different claimed adverse employment actions. And there are actually different defendants that were involved with the two different claimed adverse employment actions, with the first employment action, of course, being the or claimed adverse employment action being the placement on paid administrative leave. And that involves not the school board, Your Honor, but it involves then-Superintendent Ben Small. The school board doesn't enter into our analysis. I just spoke when I said school board. All right. So I want to start then with the paid administrative leave. And as Mr. Love correctly pointed out, it is undisputed that Mr. Thompson made that Facebook post in his private capacity. It is not conceded or undisputed that the Facebook post as a whole constituted a matter of public concern. And I would submit that this Court can and should find that it did not involve a matter of public concern. And I would ask that based upon this Court's recent finding in Adams v. County of Sacramento, 143 F. 4th 1027, that was just decided on July 9th of 2025. And in that case, this Court emphasized looking at the form and the context in which speech is made. And in that case, it was texting between individuals about a matter of, you know, public import and specifically condemnation of racist posts that these people had received. But this Court found that in that context, the speakers did not intend a broader audience than their close group of friends that they were texting with. And that is identical to what we are dealing with in this situation, because as Mr. Love just told you, it is Mr. Thompson's testimony that he only sent the Facebook message, that issue, to his 12 closest friends. And he said it was a rant among like-minded persons that were never intended to get beyond his 12 friends. Your Honor asked a question of whether the post goes to everybody on the friend list. I think what the testimony was, and it comes in later when we're talking about the decision to transfer to the teaching position, Mr. Thompson's testimony, remember, is that it was only sent to 12 of his friends, but then this alleged hacker came in and not only changed the body or message that was included in the Facebook post, but also changed the setting such that the Facebook post was seen by more than just those 12 people that he intended to send the Facebook post to. So for that reason, it is not a matter of public concern, and the Court can find uphold the summary judgment as it relates to the paid administrative leave on that ground. If the Court disagrees, then we look at what is contained in that post, and there's really two separate types of speech I would submit that are in that post. There's a criticism of the Democrat Party and specifically the Democratic National Convention, but there are also epithets that are contained in that Facebook post, and that is important, and I would point out the Court's recent case of Birch v. City of Chubbuck, which was likewise decided in July of this year, and the site is 146 F 4th 822, and in that case the Court really looked at the fact that there can be protected speech, which in that case was a yard sign from a city employee supporting somebody who was running against the mayor, as well as non-protected speech, which was the employee plaintiff's criticisms of the mayor at the office. Can I interrupt and ask you this? As I think you can tell from my questioning from your friend on the other side, what most concerns me is the initial placement on administrative leave before they're doing any investigation whatsoever. We know that this was a concession, that it was a private post. What's the justification for putting on administrative leave for a private post? Yes, so I think you have to look, Your Honor, at the purpose of the paid administrative leave, and I would submit that in this context, and when you look at the purpose of the administrative leave, it was not in fact an adverse employment action. Mr. Love said that the Dahlia case says that paid administrative leaves are adverse employment actions. That's not quite what the case says. The case says they can be adverse employment actions. That's pretty adverse to me. So, I would submit that the... Is there some other justification beyond the one that you're saying was not an adverse action? Justification meaning? I'm saying, what's the justification for putting him on paid administrative leave? I'm assuming for purposes of the question that that's an adverse employment action. Fair enough. To do an investigation to find out exactly what Your Honor is questioning, and that is, how widely disseminated was this? That is to say, was it in fact a private communication? To investigate that question. Correct, and it's really two-part. It's one, was it widely disseminated? And two, did Mr. Thompson use that type of epitaph while he was at school? And so going back to this distinction of protected versus unprotected speech, the focus for Central Valley School District from the outset of this case has been on that word demtard, and specifically on the tarred part of that. And I would submit that the evidence is very clear. It doesn't matter what preceded the term tarred. It was tarred that was so concerning to the school district, and it's so concerning to the school district because of the context of the speaker and who's using it, and his role as an educator and leader in the school district that is serving special needs students. So at the end of the day, Your Honor, the paid administrative leave is for the purpose of performing an investigation, and the investigation is for the purpose of protecting children. To find out what impact this type of language is having on students. Counsel, let me ask you the same factual question I asked Mr. Love. How many people saw the post? And these, I'm not counting the people that were intentionally shown the post to see what their reaction is, but how many people saw the post? How widely disseminated was this post? We do not know the answer to that question. We know that it passed hands I think four times before it was eventually brought to Assistant Superintendent Jay Rowell, but beyond that we don't really know. That was the point of the investigation. Did anyone else ever independently raise a concern about the post to the school? No, because when you Mr. Thompson was put on administrative leave, he took the post off of Facebook, so I don't think that it remained on there for much time after it was brought to the school district's attention. Go ahead. I was gonna say though, Your Honor, of course in the Green Balancing Test there's kind of a twofold analysis. One, has there been a known disruption? And two, is there a reasonable likelihood of future disruption? And I would point out that in this case, again the investigation is done to find out how widely disseminated it was, and I would point to the, that's part of the record and I can't cite to the exact portion of the record, but when this lawsuit was filed and made the newspaper, there were hundreds and hundreds of comments that were submitted to the, I think it was online on Facebook, the Spokesman Review's Facebook site, on both sides of the equation, you know, condemning the school district for what it did, but you know equally number if not more persons saying I would never let my child go to school at any school that this man was an administrator at. So the prediction of disruption that Ben Small had when he made the decision to put him on paid administrative leave in order to determine whether it was widely disseminated, I think was very valid, and I would point out in that regard the recent case that Mr. Love just referenced, the Damiano versus Grant Pass school district number seven case that was decided on June 17th 2025 by this court, because that case really hits at what is at the basis of this lawsuit, because it talks about the disruption to school districts as a result of the public trust in school districts. And one of the quotes that I like the most from that case, it says the position of a public school teacher requires a degree of public trust not found in many other positions of public employment, and that's because as the court points out, our school districts act in local parenti to the students that are in the in the care and concern of the school district. And so taking from that statement or that quote that I just read, in this case we're dealing with not just a teacher but an administrator, the face of the school district, who Ben Small recognizes that this post has been disseminated at least to four people that he knows of, so let's find out in order to protect the kids that we who are in our care custody and control from this type of harmful epitaph. Counsel, in Damiano, our court reversed the district court's order granting summary judgment in favor of the school given, and I quote, the numerous genuine factual disputes regarding the circumstances of plaintiffs expressive conduct and the extent of the resulting disruption. That's what I'm trying to figure out. What is the extent of the resulting disruption here? And in particular in that case, Damiano, our court noted that it is undisputed that at least some students protested in response to the campaign, but the extent of the protest was unclear. So I'm still trying to figure out, to me it seems like in Damiano the disruption was much bigger than it is here, and still our court overruled or reversed the district court's grant of summary judgment. My recollection is there was yet disputed facts upon the extent of the disruption, but what we know in our case that at the time we made the decisions, the extent of the past disruption might not have been extensive, but that's why I referred to the Facebook posts on the Spokesman Review website, because the analysis isn't solely what disruption has already occurred, it looks at what disruption can reasonably be predicted in the future, and that was what the school district accurately predicted in this case. In Damiano though, didn't they publish the video? I mean the two, the assistant principal and the teacher, they published the video. It wasn't a private post, it wasn't a post between me and my friends on Facebook. Does that make a difference that this video, I'm sorry not the video, the post here really came to life more, or was more public, because of what the school did in investigating it? If that makes any sense. In our case it became more public. I don't know if it became more public because of the investigation, because the investigation was limited. You did show it though, right? The school did show it to a few individuals to get impact statements? My understanding is they read it to them. But those people were made aware of it, and otherwise they would not have seen it? Well, if the school district hadn't taken action at the outset, for what we know it could have been widely disseminated at that point because, according to Mr. Thompson, there was a hacker that made it public. So it was because of the school district's actions, I would submit, that prevented it from being more widely disseminated. That is to say, once he's called in, he then deletes it. And you're saying had he not been called in, he might not have deleted it. Correct. I see. And I would also say, with respect to the Damiano case, two things. One, we are asking for qualified immunity for all of the individual defendants, and I believe consistent with case law that says there's rarely a case where you have to go through the Pickering balancing test that qualified immunity is not appropriate. I would point out in this case, not only does the Pickering balancing test, I submit, weigh heavily in favor of the school district, but the school district actually went through the Pickering balancing test. That's what the impact statements are for, and so I believe that entitles all the defendants to qualified immunity. And then the only last thing I'll say, Your Honor, with respect to the Damiano case, is I do think the context of the speech is different because here it's a protection of students. It's not a disruption in the education of the school district. It's a protection of the students and the epitaphs that were used. I have one more question for you. I know you're out of time, but if you wouldn't mind indulging me here. So I think I'm having kind of a hard time understanding your position. So it's not a matter of public concern because he didn't disseminate it beyond his 12 friends. But then at the same time, the school's justified in doing this because it could cause this wide disruption. Well, that relates to the administrative leave. So put him on paid administrative leave to determine whether or not it's been widely disseminated. But then the second aspect of it that I didn't get to is the transfer to the teaching position, and that is based upon what was discovered in the investigation in the in-school conduct, which is not speech or behavior that is a spoken as a private citizen, but instead was is at school, at work, public speaking, and therefore not entitled to First Amendment protection. Okay, thank you. Thank you. A couple things I want to address in my two minutes. Mr. McFarland, he mentions this, how the public saw this post and commented on it. This was after a formal lawsuit had been filed. Prior to the decision to transfer, prior to the lawsuit, there was a limited group of people that had even seen the post. It's undisputed. He talks about the public concern. Again, that is a judicial admission that he was speaking as a private citizen on a matter of public concern. When you look at the post, they've even admitted that use of the term demtard, he was referring to the Democratic Party. They also take issue with taking out to the woodshed. In the testimony that's in the record, even Mr. Small admitted that metaphorically speaking, he's talking about the Republicans beating the Democrats in the upcoming election. Similar metaphorically to a high school basketball coach telling his players, let's take him out to the woodshed. Doesn't imply that there's going to be any violence. It's just winning. In the record, Mr. Small states that the reason why he made the decision to transfer Mr. Thompson was not because there was any disruption, because there was no evidence of any disruption. He said that there was a break in trust. That was it, based on, based in part on what he had posted, and that's why they made the decision to do the transfer. It's undisputed in the record that prior to this lawsuit being filed, no media were aware, no parent contacted the school, no student contacted the school, there was no complaints from any parent, there was no complaints from a student, no complaints from any members of the community, and again, no member, this did not become a cause celeb prior to a lawsuit where it was part of the media, unlike the Damiano case, where there, the Ninth Circuit did say that there was questions of fact that required that this be remanded. So, based on what is in the record, Mr. Thompson is asking that the court reverse the lower court. Thank you very much. Thank you, counsel. The court appreciates the spirited arguments on both sides of the case, and that case shall now be submitted, or turned to.
judges: FLETCHER, GOULD, ALBA